UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

SABRINA GEMMA MONGELLI,

                              Plaintiff,

         -against-

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                              Defendant.

------------------------------------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: ___4/12/2022___

1:20-CV-8340-ALC

**AMENDED
OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Sabrina Gemma Mongelli ("Plaintiff" or "Mongelli") brings this action

challenging the Commissioner of Social Security's ("Commissioner" or "Defendant") final

decision that Plaintiff was not entitled to disability insurance benefits under Title II of the Social

Security Act (the "Act"). Before the Court are the parties' cross-motions for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c). Upon review of the submissions and for the reasons

stated below, Plaintiff's motion is **GRANTED**, and Defendant's motion is **DENIED**.

## BACKGROUND

### I.   Procedural History

On May 29, 2016, Sabrina Gemma Mongelli protectively filed an application for a period

of disability and disability insurance benefits, alleging disability starting from May 26, 2016. R.

at 124, 222, 237, 352–53.[1] Her alleged impairments included ischemic stroke, vertebral artery

dissection, hypertension, hypercoagulable state, and depression. R. at 224. Her claim was

initially denied on October 7, 2016. R. at 124, 233–37. On December 2, 2016, Ms. Mongelli

---

[1] "R" refers to the Certified Administrative Record. ECF No. 12. Pagination follows original pagination in the
Certified Administrative Record.

subsequently requested a hearing before an ALJ. R. at 124, 239–40, 250. On August 22, 2019, a hearing was held before the ALJ. R. at 124, 306, 341–46. Ms. Mongelli appeared at the hearing represented by attorney Hilary I. Nat. R. at 124, 181–82. Both Ms. Mongelli and Vocational Expert ("VE") Dennis King appeared and testified at the hearing. *Id*. The ALJ issued an unfavorable decision on September 25, 2019. R. at 121–42. The Appeals Council denied review on August 5, 2020, including declining to review additional evidence submitted after the ALJ's decision, which made that decision the final decision of the Commissioner. R. at 1–4, 124.

Ms. Mongelli brought this action in the Southern District of New York on October 5, 2020, following the Appeal Council's denial. Compl., ECF No.1. On July 19, 2021, she moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Pl.'s Mot., ECF No. 15. Defendant cross-moved for judgment on the pleadings on December 2, 2021. Def.'s Mot., ECF No. 23. Ms. Mongelli also submitted a reply memorandum to Defendant's cross-motion on December 20, 2021. Pl.'s Rep., ECF No. 25.

## II.   Factual Background

### A.   Non-Medical Evidence

#### a.   August 22, 2019 Hearing before the ALJ

##### i.   *Plaintiff's Background*

Born on March 16, 1971, Ms. Mongelli was 45 years old at the onset of her alleged disability. R. 187, 352.[2] She resides with her husband, two children, and parents. R. at 187. Plaintiff completed high school and later earned a certificate to work in podiatric radiology. R. at 188. She previously worked a composite job of radiologist, surgical technician, and orthotics technician. R. at 208–09.

---

[2] She was 48 years old when she testified at the August 22, 2019 hearing. R. at 187.

### ii.   Plaintiff's Alleged Disability

Ms. Mongelli had not worked anywhere since May 2016. R. at 190. Following her stroke, she relied on her cane to assist her when walking, and she had body numbness and problems with her memory and concentration. R. at 188–95. She also had difficulty lifting and carrying objects due to numbness in the right hand. R. at 196. If she tried to lift a pot of water, for example, her right hand would start to shake. *Id*. Ms. Mongelli expressed difficulty bending, stooping, and crouching (due to the right side of her body being completely numb, which typically required assistance). *Id.* She stated that she could prepare a sandwich for herself (but does not cook on the stove), put laundry in the washing machine (but does not lift or carry the laundry basket), and do some surface and floor cleaning (but does not bend down, lift heavy objects, or vacuum). R. at 197. She can lift or carry maybe five pounds. *Id.* Ms. Mongelli is unable to feel extreme temperatures due to her right-side numbness, which keeps her from being able to cook because she may not notice if she burns herself. R. 304–05. She could handle personal hygiene (but preferred having someone home when she showered). R. at 198. Ms. Mongelli attends Sunday mass regularly, goes to the grocery store three times a week (accompanied by others like her mother), visits family members (including to see cousins in Pennsylvania and a family trip to Canada), and attends outside dinners occasionally with family. R. 198–202.

### iii.   Dennis King – Vocational Expert (VE) Testimony

VE Dennis King examined a situation in which an individual would have similar conditions as Ms. Mongelli and testified to the likelihood of employment. R. at 208–17. He largely based his testimony on approximately 40 years' experience having placed people in jobs and seeing people work in different jobs over time. R. at 215–16.

Mr. King was first asked to determine what jobs a hypothetical individual, with the ability to perform tasks at a light exertional level with the assistance of a cane for walking distances greater than 100 feet at a time with occasional use of the right upper extremity (among other things), could do (if any). R. at 212–13. Mr. King testified that the hypothetical individual would be unable to perform Ms. Mongelli's prior work. R. at 213. However, that person could still perform other jobs. R. at 214. Mr. King stated that the hypothetical individual still possessed the ability to work as a survey worker, information clerk, or fundraiser. *Id.*

Mr. King was then offered a second hypothetical, in which the ALJ added a limitation of performing only simple, routine tasks. R. at 216. He asserted that the hypothetical individual could still work the same previously mentioned jobs (*i.e.*, survey worker, information clerk and fundraiser). *Id.* Third, the ALJ added another limitation to the second hypothetical: to be off-task for at least 15% of the eight-hour workday. R. 216–17. Mr. King stated that there would be no jobs in the national economy that one could perform with this additional limitation. R. at 217.

Plaintiff's attorney also examined Mr. King. Mr. King testified that job productivity could be affected by an individual with memory and concentration problems. *Id.* Mr. King also testified that an individual that is 10% or more off-task in an eight-hour workday would be unable to perform the jobs of survey worker, information clerk, and fundraiser. R. at 218.

b.   Disability Report

On August 23, 2016, Ms. Mongelli completed a disability report listing ischemic stroke, vertebral artery dissection, hypertension, hypercoagulable state, and depression as her medical conditions. R. at 372. She stopped working on December 3, 2015, approximately six months before her alleged onset date, because the podiatrist office where she worked closed down. *Id.* She had worked as a podiatric radiologist in the 15 years before she became unable to work. R. at

373. Ms. Mongelli took the following medications: Azar, Azore, Coumadin, Lipitor, Lisinopril, and Metoprolol. R. at 374–75. At the time, she was not seeing anyone for her alleged depression. R. at 378.

### c.   Function Report

Ms. Mongelli completed a function report on August 31, 2016. R. at 163. She reported that she lived with her husband and two adult children of ages 20 and 23. R. at 157. Ms. Mongelli stated that she required aid in her personal care, from assistance with buttoning her clothes to bathing in case she lost her balance in the bathtub. *Id*. She faced difficulty taking care of her hair due to the loss of feeling on her right side and that even using the toilet caused a bit of discomfort due to her lack of sensation. R. at 157–58. Ms. Mongelli often tried to prepare meals on her own, but it is challenging because of her inability to feel temperatures. R. at 158. Ms. Mongelli hired a cleaning lady to assist with house and yard work because she cannot do it on her own due to her lack of balance and dizziness. R. at 159. She walks daily but is unable to drive, she does not shop alone, and has noticed she often faces confusion when handling funds, such as writing and sending checks. R. at 159–60. Her hobby is reading books, which she now has difficulty doing because of her eyesight issues following the stroke. R. at 160. As for social activities, Ms. Mongelli attends Catholic services on Sundays and went to the supermarket about four times a week. *Id.* She noted her inability to drive, work, and exercise. R. at 161. She relies on a cane and walker both to walk long distances and to get out of bed. R. at 162. After walking approximately half a block, she gets spasms and has difficulty focusing. *Id.* Ms. Mongelli was stressed about not being able to perform the same activities that she was previously able to do on her own. R. at 162–63.

### B.   <u>Medical Evidence</u>

a. Relevant Portions of Treatment Record

Ms. Mongelli was admitted on May 26, 2016 at the New York-Presbyterian/Lawrence Hospital with symptoms of dizziness, left facial droop and numbness, and upper and lower extremity temperature insensitivity. R. at 445, 448. An MRI/MRA showed left lateral medullary restriction and left VA thrombus. *Id.* Her symptoms resolved "except for mild left ptosis," and she was discharged with neurology follow-up and self-administered Lovenox. R. at 445. An EKG showed no likely cardiac source. *Id.* On May 27, 2016, it was noted by neurologist Dr. George Lominadze that a CT scan from the day before was "unremarkable." R. at 448. The chief complaints were facial droop/numbness and the ataxic gate, of which it was found that Ms. Mongelli has an acute left cerebellar peduncle stroke with a left vertebral artery dissection. *Id.* Dr. Lominadaze prescribed Heparin, Atorvastatin, Lopressor and continued her on Norvasc. R. at 449.

On June 24, 2016, Ms. Mongelli followed up with cardiologist and internist Dr. Elena Vezza. R. at 478. Her diagnoses included, *inter alia*, chronic hypertension, chronic hyperlipidemia, and chronic cerebral infarction. *Id.* Dr. Vezza prescribed the following medications: Amlodipine Besylate, Atorvastatin Calcium, Enoxaparin Sodium, Metoprolol Tartrate, and Simvastatin. R. at 479. During subsequent visits with Dr. Vezza, Ms. Mongelli remained largely unchanged in her cerebrovascular accident/stroke ("CVA"): 6/27/16 (R. at 485–86), 6/29/16 (R. at 487–88), 7/11/16 (R. 489–90), 8/1/16 (R. 492–93), 8/31/16 (R. at 494), 9/14/16 (R. at 496)[3], 10/11/16 (R. at 497), 11/8/16 (R. 500–01), 11/22/16 (R. 502–03), 12/7/16 (R. at 504), and 12/20/16 (R. at 505).

---

[3] During this visit, Ms. Mongelli complained of the need for physical therapy. R. at 496.

On January 10, 2017, Ms. Mongelli complained to Dr. Vezza of increased numbness, tingling at the fingertips, and increased confusion. R. at 507–08. Several subsequent visits noted no change to her CVA: 1/24/17 (R. at 512) and 2/7/2017 (R. at 515–16). On April 13, 2017, she complained of right-side weakness, and Dr. Vezza continued her medication regimen. R. 522–23. On July 5, 2017, Dr. Vezza prescribed Atorvastatin Calcium at 80mg and Metoprolol Tartrate at 100mg. R. at 527–28. On October 6, 2017, Dr. Vezza suggested Ms. Mongelli be placed on a low-calorie diet. R. at 529–30. On May 18, 2018, Dr. Vezza gave medical clearance for upper eyelid neoplasm at the Manhattan Surgery Center. R. at 535–36.[4] Dr. Brian Brazize performed a neoplasm surgery on both upper eyelids. R. at 541.

Aside from some adjustments in prescribed medication, during visits from July 9, 2018 to May 10, 2019, Ms. Mongelli reported right-side numbness, and Dr. Vezza continued care. R. at 548–49, 555–56, 560–61, 565–66.

On June 4, 2019, Ms. Mongelli visited neurologist Dr. Vanessa Tiongson regarding Wallenberg syndrome. R. at 574–77. Dr. Tiongson's assessment indicated that an MRI of the brain was needed because Ms. Mongelli reported aphasia-type symptoms that were atypical for Wallenberg syndrome, recommended an MRA of the neck, and suggested a referral to physical therapy for "gait and strength training, vestibular exercises." R. at 577.

C.  Opinion Evidence

a.  Dr. Sharon Revan, M.D. – Internal Medicine Consultative Examination

---

[4] Ms. Mongelli, in addition to her frequent visits with Dr. Vezza, was also treated by neurologist Dr. Steven Grenell on occasion. R. at 586. During their visits, Ms. Mongelli reported increased weight, depression, memory lapses, speech difficulties, vertigo, balance issues, tingling, and numbness. *See, e.g.*, R. at 586-88 (12/12/15); R. at 589-91 (2/13/17).

Dr. Sharon Revan evaluated Ms. Mongelli on behalf of the Social Security Administration on September 27, 2016. R. at 458. The evaluation opined on Plaintiff's ischemic stroke, vertebral artery dissection, hypertension, and hypercoagulable state. R. at 460. Dr. Revan determined that her prognosis was "fair." R. at 461. Dr. Revan found that Plaintiff maintained no limitations pertaining to speech, vision, hearing, sitting, standing, or laying down. *Id.* Dr. Revan observed mild limitation with "right upper extremity for fine and gross motor activity due to her stroke," and mild to moderate limitations "for personal grooming and activities of daily living due to right leg numbness. *Id.*

   b.  Dr. Arlene Rupp-Goolnick, Ph.D. – State Agency Psychiatric Evaluation

On September 27, 2016, Dr. Arlene Rupp-Goolnick evaluated Plaintiff, reporting that she suffered frequent awakenings, depressive symptoms for lack of being able to do certain things after her stroke, anxiety symptoms for worries about her health, and difficulty focusing and finishing tasks. R. at 463–64. Dr. Rupp-Goolnick diagnosed Ms. Mongelli with adjustment disorder but ultimately found that she had stress-related problems that on their own "[did] not appear to be significant enough to interfere with [her] ability to function on a daily basis." R. at 466. Dr. Rupp-Goolnick also noted that Plaintiff could "[f]ollow and understand simple directions, perform simple tasks independently, learn new tasks, relate adequately to others, and make appropriate decisions" with no limitation. R. at 465. Dr. Rupp-Goolnick added that Plaintiff could "[m]aintain attention and concentration, maintain a regular schedule, perform complex tasks independently, and appropriately deal with stress," largely due to her physical condition, with mild limitations. *Id.* Dr. Rupp-Goolnick recommended medical follow-up and vocational training and noted that Plaintiff was in the process of learning to function with her physical limitations. R. at 466.

c.  Dr. Vanessa Tiongson – Medical Source Statement

On August 6, 2019, Dr. Tiongson wrote a letter based upon a review of Ms. Mongelli's medical records and her reports of decreased sensation of the left face and right arm/leg, left ptosis, and difficulty closing the left eye, that, in addition to those symptoms, Ms. Mongelli had difficulty walking for prolonged periods of time for she would involuntarily veer right and required assistance of her cane to prevent falls. R. at 580. Dr. Tiongson opined that her symptoms had not disappeared in the past three years since her stroke. *Id.*

d.  Dr. Elena Vezza – Medical Source Statements

Dr. Vezza's medical source statement dated January 24, 2017 indicated that Plaintiff could sit four hours in an eight-hour workday, stand for an hour, walk for an hour, lift no amount of weight, and carry (occasionally) up to 10 pounds. R. at 473–74. Dr. Vezza specified that Ms. Mongelli would, however, need intermittent breaks when engaging in these activities because of her impaired balance and central post-stroke pain. R. at 473.The statement also noted that Plaintiff could reach frequently with both hands and fingers bilaterally, occasionally feel and push/pull bilaterally, and occasionally operate foot controls on the left only (not the right foot). R. at 473–74. Dr. Vezza supported the opinion regarding lifting/carrying and sitting/standing/walking with medical findings that Plaintiff had post-stroke pain affecting the right side of her body and left side of her face, abnormal gait (*i.e.*, unable to ambulate in a straight line), blurred vision in the left eye, lateral medullary syndrome, and posterior inferior cerebellar artery syndrome. *Id.* The use of the cane to ambulate was medically necessary. R. at 473. Dr. Vezza supported the opinion on use of hands and feet capabilities with substantially similar clinical findings. R. at 474. She added that Ms. Mongelli faced difficulty focusing and staying on task and "loses [her] train of thought quickly." R. at 468–69.

On August 12, 2019, Dr. Vezza also wrote a letter addressing Ms. Mongelli's symptoms. R. at 581. The letter indicated that Ms. Mongelli suffers daily from chronic numbness on the left side of her face and the right side of her body. *Id.* It also stated her inability to sit or stand for longer than 1 hour at a time without significant paresthesia of the lower extremities, the inability to walk for more than a block without the assistance of her cane, and the inability to kneel or squat without the assistance of an instrument to assist with getting back up. *Id.* Dr. Vezza addressed that the conditions Ms. Mongelli had were permanent symptoms and had not improved in the prior three years. *Id.*

D.  <u>Additional Medical Evidence Provided to the Appeals Council after the ALJ's Decision</u>

a.  Dr. Elena Vezza – Stroke Impairment Questionnaire

On November 18, 2019, Dr. Vezza prepared a Stroke Impairment Questionnaire. R. at 83–88. Dr. Vezza stated that the other diagnoses were vertebral dissection, lateral medullary syndrome, and post-inferior cerebellar artery syndrome. R. at 83. The clinical findings that supported the referenced diagnosis was paresthesia of the right side of the body, blurred vision of the left eye, and MRI results. R. at 84. In addition, Dr. Vezza noted several primary symptoms: poor coordination, loss of manual dexterity, difficulty remembering, weakness, confusion, slight paralysis, unstable walking, numbness/tingling, pain, visual disturbance, speech/communication difficulties, and difficulties concentrating. R. at 85.

b.  Dr. Vanessa Tiongson – Stroke Impairment Questionnaire

On December 12, 2019, Dr. Tiongson completed a Stroke Impairment Questionnaire. R. at 89–95. Dr. Tiongson wrote that Ms. Mongelli's vertebral artery dissection and hypertension were not expected to improve. R. at 89. The clinical evidence in support for the assessments

were right-sided paresthesia, sensory disturbances to the left face and right arm/leg, general right-sided weakness, and MRI results. R. at 90. In addition, Dr. Tiongson noted the following primary symptoms: poor coordination, difficulty remembering, weakness, difficulty remembering, slight paralysis, numbness/tingling, pain, visual disturbance, and speech/communication difficulties. R. at 91.

   c. R.C. Krishna, M.D. – Neurology / Physical Medicine & Rehabilitation Consultation

On February 6, 2020, based on a review of a subset of medical evidence, including impairment questionnaires from June 2016 through November 2019, medical records from December 2019, VNG testing in February 2020, and an MRI in June 2019, Dr. Krishna recommended that Ms. Mongelli obtain EMG/NCV studies of the upper extremities to determine the exact level of neuropathic pain syndrome, obtain prescriptions for pain modulating agents, and obtain periodic spine imaging. R. at 40, 42.

## APPLICABLE LEGAL STANDARDS

### A. Judicial Review of the Commissioner's Determination

A district court reviews the final decision of the Commissioner under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted)).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin*., 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citation omitted). In other words, this Court must afford the Commissioner's determination considerable deference and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a difference result upon a *de novo* review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted).

## II.  Commissioner's Determination of Disability

### A.  Definition of Disability

Under the Act, a disability is defined as one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Further, "[t]he impairment must be of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Shaw v. Charter*, 221 F.3d 126, 131–32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A) (internal quotation marks omitted)).

### B.  The Commissioner's Five-Step Analysis of Disability Claims

The Commissioner must use a five-step process in order to determine whether a claimant has a disability under the Act. 20 C.F.R. § 404.1520(a)(4). The Commissioner must first determine whether the claimant is currently engaged in substantial gainful activity. *Id.*; 20 C.F.R. § 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, then the claimant

is not disabled. *Id.* If the claimant has not engaged in substantial gainful activity, then the Commissioner will proceed to the next step. The Commissioner must then consider whether the claimant has a "severe medically determinable physical or mental impairment" or a combination of impairments which meet the duration requirements of a continuous period of 12 months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509 (establishing duration requirement). If the claimant suffers from such an impairment, the Commissioner then determines whether the impairment(s) meet or are medically equivalent to the criteria of the listed impairment in Appendix 1 of the Social Security Act regulations. 20 C.F.R. § 404.1520(a)(4)(iii); *see also id.* § Pt. 404, Subpt. P, App'x 1. If the claimant does not have a listed impairment, the following inquiry would concern whether, despite the claimant's impairment(s), the claimant has the residual functional capacity ("RFC") to perform their past work. 20 C.F.R. § 404.1520(a)(4)(iv). Lastly, if the claimant is unable to perform his past work, the Commissioner must determine whether there is other work of which the claimant could perform. 20 C.F.R. § 404.1520(a)(4)(v).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and 'bears the burden of proving his or her case at steps one through four." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). However, in the last step, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhard*, 388 F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. §404.1560), *amended on reh'g*, 416 F.3d 101 (2d Cir. 2005); *see also* 20 C.F.R. §404.1520(a)(4)(v).

C.   The Decision of the ALJ

The ALJ found that Ms. Mongelli was not disabled pursuant to the Act. R. at 137.

First, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since May 26, 2016, the alleged onset of disability. R. at 126.

Second, the ALJ determined that Plaintiff had the following severe impairments: status post ischemic stroke, chronic lacunar infarct, vertebral artery dissection, lateral medullary syndrome, and obesity. R. at 126–28.

Third, the ALJ determined that Plaintiff's impairments, alone or in combination, did not meet the medical equivalent of the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1 (the "Listings"). R. at 128–29.

Fourth, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following additional limitations:

> [Mongelli] must use a cane for walking distances greater than 100 feet at one time. She could occasionally operate right hand controls with her right upper extremity and occasionally operate right foot controls. She could frequently handle objects with her right upper extremity but not on a constant basis. She could occasionally climb ramps and stairs and could not climb ladders, ropes or scaffolds. She could occasionally balance, frequently stoop, and occasionally crouch and crawl. She could not work at unprotected heights, with machinery having moving mechanical parts which are exposed, or with sharp tools.

R. at 129–35.

Fifth, the ALJ determined that Plaintiff is not able to perform substantial gainful activity in any past relevant work under 20 C.F.R. § 404.1565. R. at 136. She previously worked a composite job of radiologist, surgical technician, and orthotics technician at the heavy exertion level. *Id.*

Sixth, the ALJ considered Plaintiff's age, educational background, vocational experience (including the transferability of job skills), and RFC, and concluded that with adjustments, there are a substantial amount of available jobs in the national economy that Plaintiff can perform, including survey worker, information clerk, and fundraiser. R. at 136–37.

14

Finally, the ALJ found that Plaintiff was not disabled within the meaning of the Act. R. at 137.

## DISCUSSION

Plaintiff asserts that the ALJ's RFC determination is erroneous because (1) the ALJ failed to properly weigh the medical opinion evidence, and (2) the ALJ failed to properly evaluate her subjective statements about intensity, persistence, and the limiting effects of symptoms. Ms. Mongelli also argues that (3) upon review, the Appeals Council erred in failing to consider new and material evidence made available after the ALJ issued the decision denying her application. The Court addresses each contention in turn.

### I.  The ALJ Procedurally Erred in Formulating an RFC for Plaintiff

A plaintiff's residual functional capacity "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a). The ALJ "[is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 Fed.Appx. 53, 56 (2d Cir. 2013) (summary order) (citing *Perales*, 402 U.S. at 399). The ALJ determined that Plaintiff was unable to perform any past relevant work, but, after evaluating the entire record, that she had the RFC to perform light work with many specific limitations. R. at 129. The Court holds that the ALJ procedurally erred in formulating the RFC because the ALJ failed to sufficiently provide good reasons, under *Burgess* and its progeny, for giving less-than-controlling weight to treating source statements in formulating the RFC.

A.  <u>The ALJ Erred in Weighing the Medical and Other Evidence in the Record</u>

Plaintiff contends that the ALJ failed to properly apply the treating physician rule[5] to medical source statements from treating cardiologist/internist—Dr. Vezza—and treating neurologist—Dr. Tiongson—by giving greater weight to the opinion of consultative examiner Dr. Revan. The substance of Mongelli's contention is that the ALJ failed to explain, as required by the mandates of the Act and Second Circuit case law, why the treating source opinions were given less weight than other evidence in the record.

Under the treating physician rule, the opinion of a plaintiff's treating physician is afforded "controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Burgess*, 537 F.3d at 128 (internal citations and quotation marks omitted). "Generally, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with . . . the opinions of other medical experts, for genuine conflicts in the medical evidence are for the Commissioner to resolve." *Id.* (internal citations and quotation marks omitted). An ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Crowell v. Comm'r of Soc. Sec. Admin.*, 705 Fed.Appx. 34, 35 (2d. Cir. 2017) (summary order) (quoting *Burgess*, 537 F.3d at 128) (internal quotation marks omitted).

Under *Burgess*, the ALJ must decide whether a treating physician's medical opinion merits "controlling weight," and if it does not, then "determine how much weight, if any, to give it" based on certain factors. *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019). "[T]he ALJ must explicitly consider several factors in determining the proper weight to assign, including: "(1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence

---

[5] The Parties do not dispute that the treating physician rule governs this case, and her claims were filed prior to March 27, 2017.

supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist (the '*Burgess factors*')." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129 (2d Cir. 2008)).

     a. Dr. Elena Vezza

Ms. Mongelli argues that the ALJ gave "little weight" to Dr. Vezza's opinion regarding her ability to sit, stand, walk, lift, carry, and use her hands and feet. Her medical source statement indicated that Plaintiff could sit four hours in an eight-hour workday, stand for an hour, walk for an hour, lift no amount of weight, and carry (occasionally) up to 10 pounds. R. at 472–74. She also noted that Plaintiff could frequently reach with both hands and fingers bilaterally, occasionally feel and push/pull bilaterally, and occasionally operate foot controls on the left only (not the right foot). *Id.* The ALJ gave "little weight" to these portions of the opinion because "they were inconsistent with the medical evidence of record as a whole and the examination of claimant by Dr. Revan" and generally "more restrictive than was warranted by the record." R. at 134. The entirety of the ALJ's explanation for giving less than controlling weight to those parts of the opinion stated:

> An MRI of the claimant's brain revealed an acute to subacute infarct in the inferior left cerebellar peduncle with suspected dissection of the V4 segment of the left vertebral artery. Ex. 2F, p. 2. A follow up MRI found chronic lacunar infarct in the left lateral medulla and minimal chronic ischemic changes involving the pons. Ex. 9F, p. 1. She was also diagnosed with lateral medullary syndrome. Ex. 12F, p. 5. Initially she was observed with an ataxic gait, numbness, left facial droop, facial numbness, and pedal edema. Ex. 1F, p. 8, 11-12. The consultative examiner noted that she needed help changing for the examination and getting on and off the examination table. Her straight leg raise testing was negative. She retained five out of five strength on the left side, but had four out of five strength in the right upper extremity. Ex. 3F. Physical examination found the claimant with right side weakness. However, she had intact facial sensation, normal muscle bulk and tone, no pronator drift, a normal gait, and normal coordination. She was alert, had fluent speech, intact comprehension, followed commands, and had normal concentration. Ex. 8F, p. 4, 9, 37; Ex. 9F, p. 5.

*Id.*

The ALJ failed to provide good reasons as to why "little weight" was assigned to the relevant portions of Dr. Vezza's treating source statements. More specifically, the ALJ does not explicitly address "the frequency, length, nature, and extent of treatment," and "the amount of medical evidence supporting the opinion." *Estrella*, 925 F.3d at 95-96; *Selian*, 708 F.3d at 418. While the ALJ does seem to implicitly reference other medical evidence that is contrary to the treating source statements, the ALJ did not consider that Dr. Vezza had treated Plaintiff since June 2016—beginning approximately a month after her stroke and alleged onset of disability—through at least June 2019 and had also provided opinions on work-related activities with support from clinical findings from the medical record. For example, after an MRI on June 10, 2019, Dr. Vezza provided an additional medical source statement opining that Plaintiff was permanently unable to sit or stand for longer than one hour at a time without "significant paresthesia of the lower extremities," could not "walk longer than one half of a block without the use of a cane," "must stop to either rest against a wall and/or sit before continuing," and could not kneel or squat low to the ground without needing assistance to get back up. R at 581. Dr. Vezza stressed that her symptoms had not improved over the past three years of treatment following the stroke. *Id*. Because of "the frequency, length, nature, and extent of treatment," as well as "the amount of evidence supporting the opinion[s]," the ALJ was required to explicitly consider those factors in determining that Dr. Vezza's opinion was entitled to "little weight" regarding Ms. Mongelli's work-related ability to sit, stand, walk, lift, carry, and use her hands and feet.

b.  Dr. Vanessa Tiongson

Plaintiff also argues that the ALJ gave "little weight" to Dr. Tiongson's medical opinion because it was "vague" as to functional limitations and was generally inconsistent with medical

evidence in the record. R. at 135. Dr. Tiongson opined that Plaintiff had some permanent damage to her left medulla and pons, which resulted in permanent deficits. *Id.* Dr. Tiongson also noted that Ms. Mongelli would veer to the right after prolonged walking and needed a cane to prevent from falling down. *Id.* The ALJ again provided very little explanation in giving less than controlling weight to the opinion of Dr. Tiongson, largely repeating what was stated in giving less weight to Dr. Vezza's opinion.

> An MRI found chronic lacunar infarct in the left lateral medulla and minimal chronic ischemic changes involving the pons. Ex. 9F, p. 1. Initially she was observed with an ataxic gait, numbness, left facial droop, facial numbness, and pedal edema. Ex. 1F, p. 8, 11-12. The consultative examiner noted that she needed help changing for the examination and getting on and off the examination table. Her straight leg raise testing was negative. She retained five out of five strength on the left side, but had four out of five strength in the right upper extremity. Ex. 3F. Physical examination found the claimant with right side weakness. However, she had intact facial sensation, normal muscle bulk and tone, no pronator drift, a normal gait, and normal coordination. She was alert, had fluent speech, intact comprehension, followed commands, and had normal concentration. Ex. 8F, p. 4, 9, 37; Ex. 9F, p. 5.

The Court concludes that this explanation is insufficient. The ALJ does not explicitly address "the frequency, length, nature, and extent of treatment," "the amount of medical evidence supporting the opinion," or "whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96; *Selian*, 708 F.3d at 418. The ALJ did not consider that neurology specialist Dr. Tiongson based the opinion on a review of Mongelli's medical records and an office visit on June 4, 2019. R. at 580. The ALJ briefly referenced snippets of contrary medical treatment notes and found the opinion "vague," but overall failed to provide good, specific reasons, as required by *Burgess* and its progeny, in giving "little weight" to this opinion.

 Plaintiff also states that the ALJ failed to fulfill the affirmative duty to develop the factual record by requesting clarifying opinion evidence from Dr. Tiongson after determining that the original opinion was "vague." Unlike trial judges, an ALJ adjudicating Social Security

benefits cases must affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even when a claimant is represented by counsel. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). The ALJ has a duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits. *Id.* at 112–13. They must take into consideration documents that are both relevant and available at the time of the hearing. *See Rose v. Comm'r of Social Sec.*, 202 F.Supp.3d 231, 242 (E.D.N.Y. 2016). While the ALJ must supplement the record through their own initiative when the record is incomplete or inadequate, this burden does not attach when the record is ample. *See Valoy v. Barnhart*, No. 02 Civ. 8955, 2004 WL 439424, at *7 (S.D.N.Y. Mar. 9, 2004).

Here, the Court agrees with the ALJ that the opinion proffered by Dr. Tiongson is not very specific as to functional limitations or capabilities. "However, that does not mean that Dr. [Tiongson] . . . was unable to provide a more comprehensive rationale for [the] opinion[ ]." *Moore v. Comm'r of Soc. Sec. Admin.*, No. 1:19-CV-03588 (ALC), 2020 WL 5768922, at *10 (S.D.N.Y. Sept. 28, 2020). In addition, Dr. Tiongson is a neurologist who could provide a medical opinion that would further develop the record as to whether, and to what extent, Plaintiff's neural impairments impacted her sitting/standing/walking, lifting/carrying, and use of hands and feet. The ambiguity surrounding which functions, if any, are limited by the permanent neural damage suffered by Ms. Mongelli would provide needed objective support that is relevant to the disability determination and could possibly have led the ALJ to afford Dr. Tiongson's opinion controlling, rather than "little," weight. "Applicable SSA regulations further require an ALJ to 'seek additional evidence or clarification from [the] medical source when [a] report from [the] medical source contains a conflict or ambiguity that must be resolved' to determine whether the claimant is disabled." *Rolon v. Comm'r of Social Security*, 994 F.Supp.2d 496, 505 (S.D.N.Y.

20

2014) (alterations in original (quoting 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (2010)),

*amended,* How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651, 10,656

(Feb. 23, 2012) (deleting former paragraphs (e) and redesignating former paragraphs (f) as

paragraphs (e), effective March 26, 2012)). The Court does not imply that supplementation of the

record would alter the ALJ's decision. But, on the current record, it is possible.

B. <u>The ALJ Failed to Properly Evaluate Plaintiff's Subjective Statements Regarding the
Intensity, Persistence, and Limiting Effects of the Alleged Symptoms</u>

Plaintiff asserts that the ALJ failed to properly evaluate her subjective statements

concerning the intensity, persistence, and limiting effects of her symptoms, finding that they

were inconsistent with the medical evidence and that Plaintiff could engage in some daily living

activities. As discussed above, because the administrative record is incomplete and the ALJ

procedurally erred in failing to provide good reasons for affording less-than-controlling weight to

treating source opinions, the Court is unable to conclude that the ALJ properly evaluated

Plaintiff's subjective statements of intensity, persistence, and limiting effects of alleged

symptoms.

When making an RFC assessment, the ALJ must consider "functional limitations and

restrictions that result from an individual's medically determinable impairment or combination

of impairments, including the impact of any related symptoms." *Titles II & XVI: Assessing*

*Residual Functional Capacity in Initial Claims*, SSR 96-8P (S.S.A. July 2, 1996) (henceforth,

"SSR 96-8P"). "The RFC assessment must first identify the individual's functional limitations or

restrictions and assess his or her work-related abilities on a function-by-function basis." *Id.;*

*Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013). These functions include physical (standing,

sitting, walking, lifting, carrying, pushing, pulling), mental (understanding, remembering,

carrying out instructions, and responding to supervision), and other abilities that may be affected

by impairments (seeing, hearing, ability to tolerate environmental factors). *See* SSR 96-8P; *see*

*also* 20 C.F.R. § 404.1545(b)-(d); 20 C.F.R. § 416.945; *Cichocki*, 729 F.3d at 176. "RFC is not

the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-

8P.

An ALJ "has the discretion to evaluate the credibility of a claimant and to arrive at an

independent judgment . . . in light of medical findings and other evidence, regarding the true

extent of the pain alleged by the claimant." *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)

(internal citation omitted). The intensity and persistence of the claimant's symptoms must be

evaluated based on all the available evidence. *See* 20 C.F.R. §§ 404.1529(a)-(c) and 416.929(a)-

(c). Additionally, if an individual alleges impairment-related symptoms, ALJs must:

> First . . . consider whether there is an underlying medically determinable physical
> or mental impairment(s) that could reasonably be expected to produce an
> individual's symptoms, such as pain. Second, once an underlying physical or
> mental impairment(s) that could reasonably be expected to produce an individual's
> symptoms is established, . . . evaluate the intensity and persistence of those
> symptoms to determine the extent to which the symptoms limit an individual's
> ability to perform work-related activities . . .

SSR 16-3p. ALJs are only required to discuss factors that are "pertinent to the evidence of

record." *Id.*

Here, Plaintiff testified that she had to rely on her cane to walk; that she suffered body

numbness on her right side and difficulty with memory and concentration; had difficulty carrying

and lifting objects due to her right-hand weakness; and had problems bending, stooping, and

crouching on her own. R. at 188–96. She reported that she could prepare a sandwich, place

clothes in the laundry machine, and do surface cleaning (so long as she did not need to bend or

lift heavy objects), as well as handle personal hygiene (though she preferred someone be around

in case she needed assistance for showers). R. at 197–98. Ms. Mongelli also indicated that she attends Sunday mass regularly, goes to the grocery store three times a week (but not alone), and visits family members (but her husband drives). R. at 198–202.

The ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. at 130. The ALJ looked to some treatment notes dating back to the time her stroke occurred, Dr. Revan's consultative examination, and Plaintiff's own statements about daily living activities, to draw this conclusion. R. at 130–31, 135. This support may constitute substantial evidence. However, as discussed above, the failure to properly evaluate the treating physicians' opinions and to further develop the factual record regarding functional limitations prohibits this Court from adequately determining whether the ALJ erred in giving less credibility to Plaintiff's subjective statements of intensity, persistence, and limiting effects of her symptoms. On remand, the ALJ will be tasked with supplementing the factual record and explaining its reasons for giving "little weight" to the treating source opinions. At that point, the ALJ should make a proper credibility determination about Plaintiff's subjective statements.

C. Medical Evidence Submitted to the Appeals Council After the ALJ Issued a Decision Should Be Considered on Remand

After the ALJ issued the decision, Plaintiff submitted supplemental evidence to the Appeals Council, which included more treatment notes from Drs. Vezza and Tiongson, a CT scan, additional stroke impairment questionnaires, and a neurological consultation performed by Dr. Ranga Krishna. R. at 8–26, 36, 39, 68, 109–12. This new and material evidence should be

considered by the ALJ on remand. *See Pollard v. Halter*, 377 F.3d 183, 193–94 (2d Cir. 2004)

(remanding case and directing Commissioner to consider new evidence "in conjunction with the

existing administrative record" and noting that new evidence on remand may support "earlier

contentions" regarding the claimant's condition). The Court finds that the evidence is relevant to

the disability determination, relates to the period before the ALJ's decision (even though the

clinical findings were made post-decision), and is not wholly duplicative of evidence previously

considered during the administrative process. The Court would like to make clear, however, that

this directive to the ALJ is not the basis for remand.

## <u>CONCLUSION</u>

For the reasons above, Plaintiff's motion is **GRANTED**, and Defendant's motion is

**DENIED**.[6] This case is hereby remanded for further proceedings consistent with this opinion.

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

Dated: April 12, 2022

      New York, New York

                          **ANDREW L. CARTER, JR.**
                          **United States District Judge**

---

[6] To be clear, this Amended Opinion and Order amends and supersedes the order dated March 31, 2022. ECF No. 26.